IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br>ROGER TAYLOR,<br>   a/k/a Milk<br><br>              **Defendant** | CRIMINAL NO. CCB-16-597 |

**RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION
FOR REVIEW OF DETENTION BY AGREEMENT**

Defendant, Roger Taylor, seeks a review of his detention pending sentencing. *See* ECF No. 747. While Taylor initially consented to detention and styles his request as being made pursuant to 18 U.S.C. §3145(b), the controlling statute is actually 18 U.S.C. §3143(a)(2), something which Taylor acknowledges in a footnote to his motion. *Id.* Because Taylor has pled guilty and is awaiting sentencing, under 18 U.S.C. §3143(a)(2) Taylor must show (1) that there is a substantial likelihood that a motion for acquittal or new trial will be granted or; (2) an attorney for the Government has recommended that no sentence of imprisonment be imposed; <u>and</u> that the judicial officer finds by clear and convincing evidence that Taylor is not likely to flee or pose a danger to the safety of another person or the community if released. Taylor cannot meet any of the conditions under 18 U.S.C. §3143(a)(2) and his request for a review of his detention status should be denied without a hearing.

**BACKGROUND**

On June 29, 2017 a federal grand jury returned a superseding indictment, in which Taylor was charged in Count One with conspiracy to violate the racketeering laws of the United States, in violation of 18 U.S.C. §1962(c); Count Two, violent crime in aid of racketeering, in violation

1

of 18 U.S.C. §1959(a)(1); and Count Three, Conspiracy to distribute and possess with the intent to distribute narcotics, in violation of 21 U.S.C. §846.  ECF No. 87.  On June 30, 2017, an arrest warrant was issued for Taylor in connection with the indictment.  ECF No. 89.  On June 7, 2018, a second superseding indictment was returned in which Taylor was charged again in Counts One, Two and Three.  ECF No. 296.  Sometime between the return of the superseding and second superseding indictment, Taylor fled and was not located and arrested until June 30, 2019- - two years to the day from which the superseding indictment was returned.

On February 3, 2020 Taylor appeared in the District Court and pled guilty to Count One of the Second Superseding Indictment, which charged him with Conspiracy to Participate in a Racketeering Enterprise, in violation of 18 U.S.C § 1962(d) and Count One of a Superseding Criminal Information which charged him with Conspiracy to Possess with Intent to Distribute and to Distribute more than five (5) kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A).  Taylor's plea was entered pursuant to Fed. R. Crim. 11(c)(1)(C).  ECF No. 742.

## ARGUMENT

As previously noted 18 U.S.C. §3143(a) (2), which deals with release or detention pending sentence provides:

> The judicial officer shall order that a person who has been found guilty of an offense in a case described in subparagraph (A), (B), or (C) of subsection (f)(1) of section 3142 and is awaiting imposition or execution of sentence be detained unless--
> **(A)(i)** the judicial officer finds there is a substantial likelihood that a motion for acquittal or new trial will be granted; or
> **(ii)** an attorney for the Government has recommended that no sentence of imprisonment be imposed on the person; and
> **(B)** the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to any other person or the community.

Taylor pled guilty, pursuant to  Fed. R. Crim. 11(c)(1)(C), see ECF No. 742 at 6, for an agreed upon sentence of between **11 and 14 years.**  Thus, Taylor fails to meet the requirements of 18 U.S.C. §3143(a)(2)(A)(i) and (ii).  Moreover, the statute is in the <u>conjunctive</u>.  Thus, Taylor

must first meet the requirements under 18 U.S.C. §3143(a)(2)(A)(i) and (ii), before under §3143(a)(2)(B) a judge can even consider making a finding by a clear and convincing evidence that Taylor is not a flight risk or a danger. Taylor's convictions here are for racketeering and conspiracy to distribute controlled substances. These serious offenses more than raise a specter of danger. Indeed, Taylor has multiple convictions for drug offenses. The legislative history of the Bail Reform Act of 1984 makes clear that Congress intended that the "safety of the community" language in Section 3142 was expected to be given a broad construction. *See* S. Rep. No. 225, 98th Cong., 1st Sess. 12 (1983), *reprinted in 1984* U.S.C.C.A.N. 3182, 3195 ("The reference to safety of any other person is intended to cover the situation in which the safety of a particular identifiable individual, perhaps a victim or witness, is of concern, while the language referring to the safety of the community refers to the danger that the defendant might engage in criminal activity to the detriment of the community. *The Committee intends that the concern about safety be given a broader construction than merely danger of harm involving physical violence.*") (emphasis added). S. Rep. at 15. The risk that a defendant will continue to sell narcotics was repeatedly cited as an example of a danger to the "safety of any other person or the community." *Id*. at 16, 22-23. *See also United States v. Williams,* 753 F.2d 329 (4th Cir. 1985) (It is well known that drug trafficking is carried on to an unusual degree by persons engaged in continuing patterns of criminal activity. Persons charged with major drug felonies are often in the business of importing or distributing dangerous drugs and thus, because of the nature of criminal activity with which they are charged, they pose a significant risk of pretrial recidivism). Here, the Defendant has not only multiple drug convictions, he now has been convicted yet again and of significant quantities of cocaine. Furthermore, as this Court well knows, Taylor's association with Montana

Barronette, Terrell Sivells, John Harrison[1] and members of Trained To Go (TTG) and his conviction in the RICO conspiracy demonstrate he is a danger.

As to risk of flight, Taylor remained a fugitive for two years and was found in the Dominican Republic, where he was living under an assumed name. At the time of Taylor's arrest he was in possession of false identification documents. He cannot seriously claim that he is not a flight risk, particularly when he is facing a sentence of 11-14 years in the Bureau of Prisons.

In an apparent effort to seek his release, Taylor states he has asthma. Presumably, this is an effort to seek release because of COVID. There is no evidence that Taylor himself has COVID-19. Rather, suggesting that his asthma and being incarcerated poses a health risk. Notwithstanding the COVID-19 outbreak, that factor does not weigh heavily, if at all, in favor of Taylor's release pending sentencing.

Currently, there are no cases of COVID-19 at CDF. Taylor has not said he has COVID-19. He does not allege that he has been exposed to any individuals with COVID-19. In this way, he is not seeking release based on his *actual* physical and mental health. Instead, he relies solely on the *possibility* of becoming infected. As discussed below, however, CDF has implemented substantial precautionary measures to mitigate this risk.[2]

The Maryland Department of Public Safety and Correctional Services ("DPSCS") has established a comprehensive set of precautionary measures to limit the risk of COVID-19

---

[1] All three individuals, Barronette, Sivells and Harrison have been sentenced to life imprisonment for their roles in TTG.

[2] The following individuals provided information about the health measures that have been established at CDF: (1) Gary McLhinney, DPSCS Assistant Secretary; (2) Sharon Baucom, DPSCS Director of Clinical Services; (3) Sterling Johnson, Supervisors, USMS for the District of Maryland; and (4) DPSCS Lieutenant Nina Rizer.

4

transmission into and inside CDF.[3] DPSCS is committed to providing all necessary precautionary measures and supportive therapies to avoid an outbreak of COVID-19, including taking all of the preventative actions advised by the Centers for Disease Control and Prevention (CDC) and Maryland Department of Health (MDH) regarding the disease.

DPSCS officials have substantial experience ensuring that viral outbreaks do not occur at their facilities. They recognize the unique threat posed by the transmission of viruses inside a jail, and longstanding policies and procedures already exist to ensure an outbreak does not occur of many serious diseases, such as HIV/AIDS, MRSA, sexually transmitted diseases, viral hepatitis, tuberculosis, and seasonal influenza. When faced with the potential for transmission of other notable viruses in recent history—such as, Avian Influenza (i.e., bird flu), H1N1, Severe Acute Respiratory Syndrome (i.e., SARS), and Ebola—DPSCS facilities, including CDF, did not suffer any outbreaks.

That being said, DPSCS recognizes that COVID-19 carries an increased risk of transmission; that COVID-19 carries a higher fatality rate than many other viruses; and that the COVID-19 situation has resulting in a state of emergency. Accordingly, DPSCS has employed the following measures at CDF[4]:

- *Social Visitation*. DPSCS has placed a temporary hold on all social visits, such as visits from friends and family, as well as all outside programming, to limit the number of people entering CDF and interacting with detainees.[5] Defense attorneys are still permitted to visit their clients in person; however, attorneys and detainees are separated by a glass wall and communicate with each other through the use of a telephone.

---

[3] Although CDF is a facility for federal pre-trial detainees, it is managed by DPSCS pursuant to a contract with the USMS.

[4] Because the health situation is rapidly evolving, new policies and procedures at CDF are constantly being implemented.

[5] Due to the hardship this poses, DPSCS has given each detainee five free telephone calls per day to ensure that each detainee is able to remain in contact with friends and family members.

5

- *Detainees Entering the Facility.* Unlike many of DPSCS's facilities, which are needed to house the constant influx of new state arrestees, CDF houses federal detainees and, at this time, few federal detainees are entering CDF. The only new detainees entering CDF are a limited number of new arrestees who present a particular safety risk to the community and individuals already are in transit to the facility.

- *Screening Procedures.* In the few instances in which a new detainee enters CDF, he will be housed in an intake facility for approximately one week, where he will be screened by medical professionals for coronavirus symptoms and exposure risk factors before being placed in the general population.

- *Detainee Movement.* The Court's Second Amended Standing Order postponed all criminal trials scheduled to commence through April 24, 2020, and postponed all criminal proceedings through March 27, 2020. Case No. 1:00-mc-0302, ECF No. 93 (filed Mar. 14, 2020). This means that detainees will not need to leave CDF during this period for any court appearances, except for emergencies. In the event that a detainee has a court appearance, he will be screened for symptoms before entering the transport van and, upon reaching the courthouse, his temperature will be taken twice via a forehead thermal reader to ensure he does not have a fever. To further avoid the possibility of exposure, the USMS has issued a prohibition on prisoner transfers to the courthouse or elsewhere for proffers, including a prohibition on agent transport writs and Chief Judge Bredar's memorandum requests that would permit agents to pick up prisoners from a facility.

- *Sanitation and Hygiene.* Each detainee is in possession of his own supply of soap to wash his hands at any time throughout the day. Moreover, CDF recently completed a $1.1 million shower renovation, as a result of which detainees may shower whenever they wish. Signs and hand sanitizer have been posted throughout the facility, educating detainees and correctional officers about proper hygiene and encouraging them to wash their hands frequently. The Secretary of DPSCS also has ordered that all facilities, including CDF, increase surface cleaning. In addition to paid sanitation employees, CDF has trained a group of detainees whose full time job is constantly to disinfect and clean all surfaces that could be touched.

- *Quarantine.* DPSCS is following the CDC guidelines regarding testing for COVID-19 and isolation of individuals with symptoms and/or risk exposure factors. If a detainee exhibits flu-like symptoms or presents risk exposure factors, designated cells in a remote part of CDF have been set aside to serve as a quarantine area, where medical professionals can monitor those detainees. Across the street from CDF is a DPSCS facility with "negative pressure rooms," where the ventilation is designed to avoid re-circulating air into the general population to limit the possibility of cross-contamination from room to room.

- *Correctional Officers.* Although correctional officers will need to enter and re-enter the facility, they have received multiple mandatory trainings over the past week about how to mitigate the risk of exposing detainees to the disease. Correctional officers have been ordered to stay home if they have any symptoms of the disease, and advanced paid leave will be provided for any employees who have not accrued sufficient paid leave, to disincentive sick employees from coming to work to avoid loss of pay.

Finally, in order to ensure that the Court remains apprised of these and other precautionary measures, the USMS has been in contact with Chief Judge Bredar. The USMS has appointed Steven D. Akers, the former Assistant USMS Chief, to serve as a liaison with the Court, and to respond to any inquiries regarding conditions at CDF and the measures being taken in response to the COVID-19 situation.

By virtue of being in a detention facility, Taylor is in the presence of medical professionals at all times. Each DPSCS facility has privatized medical doctors and nurses who monitor and provide care onsite to detainees who have chronic diseases, such as asthma, diabetes, and hypertension. There are multiple points of access for detainees with asthma and other chronic diseases to seek medical care, whether for routine or emergency needs, including on-site dispensaries, infirmaries, and clinics that provide acute and chronic treatment for these types of illnesses. In addition, clinical pharmacists are on call at all times, day or night. If Taylor should need intensive treatment that cannot be provided inside CDF, there is a hospital located directly across the street from CDF to provide non-emergency care and detainees are transported to community hospitals in the event of an emergency.

Between the medical professionals at CDF and the medical professionals at the hospitals, Taylor has access to all of the care that he needs. In the unlikely event that Taylor becomes infected with COVID-19, he will be quarantined, monitored, and receive any needed treatment, consistent with the CDC guidelines. And if Taylor needs specialized care for an unforeseen illness or injury, the medical staff at CDF will refer him to an outside professional. In short, there are sufficient

resources, both inside and outside CDF, to ensure that Taylor's medical needs are addressed. If Taylor were released, it is doubtful that he would have much more access to healthcare in the community. While the COVID-19 virus is new, health claims by detainees are not. In this case, Taylor simply has not made a factual record that his needs will not be met while detained.

The Magistrate Judges in this District, however, have repeatedly detained defendants like Taylor to protect the community *from them*. The speculative prospect of a COVID-19 outbreak at CDF does not diminish the public interest in keeping drug dealers and violen gang members off the streets. In light of the protective measures now in place at CDF, and given DPSCS's prior track record in avoiding viral outbreaks at their facilities, the specter of a COVID-19 outbreak is not a fire alarm that defendants can pull because they wish to get out of jail. The continued detention of defendants like Taylor is necessary to ensure public safety and does not endanger public health.

## CONCLUSION

For the foregoing reasons, the Court should denyTaylor's motion without a hearing and order his continued detention pending resentencing.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:  _____/s/_____
Christopher J. Romano
Assistant United States Attorney
36 S. Charles St., 4th Fl.
Baltimore, Maryland 21201

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this __3rd__ day of April, 2020, a copy of the foregoing Government's Response In Opposition To Defendant's Review Of Detention By Agreement was electronically filed with notice to counsel of record:

_____/s/_____
Christopher J. Romano
Assistant United States Attorney